## Zewdu Lakew vs. Massachusetts Bay Transportation Authority.

No. 05-P-672.

Middlesex. February 6, 2006. - March 22, 2006.

Present: Perretta, Kafker, & Green, JJ.

*Massachusetts Bay Transportation Authority,* Contract. *Contract,* Third party beneficiary. *Negligence,* One owning or controlling real estate, Security services, Comparative.

In an action arising out of injuries suffered by the plaintiff during an armed robbery that occurred while he was on duty as a parking lot attendant in a garage owned by the defendant and leased to the plaintiff's employer, the plaintiff could not recover damages from the defendant on a theory of breach of contract, where the plaintiff was not an intended beneficiary of the provisions of the lease between the employer and the defendant concerning the provision of security services. [797-801]

Evidence at the trial of a personal injury action sufficiently raised the question of comparative negligence to warrant a jury instruction on that topic, and the trial court judge's failure so to instruct warranted a new trial on the plaintiff's negligence claim. [801-802]

Civil action commenced in the Superior Court Department on December 10, 1999.

The case was tried before *Peter M. Lauriat,* J.

*John J. Bonistalli* for the defendant.

*Charles R. Capace (Phyllis Schacht* with him) for the plaintiff.

Green, J. The plaintiff suffered injuries from an armed robbery, which occurred while he was on duty as a parking lot attendant in a parking garage owned by the defendant, the Massachusetts Bay Transportation Authority (MBTA), in Quincy. The plaintiff brought a complaint in the Superior Court seeking damages on theories of negligence and breach of contract.[1] A

---

[1]As discussed below, the plaintiff's breach of contract claim rested on his

jury found for the plaintiff on both counts and awarded damages in the amount of $501,000. On appeal, the MBTA assigns error to the trial judge's denial of its request for instruction to the jury on comparative negligence, and asserts that the claim for breach of contract fails as matter of law because the plaintiff was not an intended beneficiary of the lease between the MBTA and the plaintiff's employer.[2] We agree that the plaintiff was not an intended beneficiary of the lease, and direct entry of judgment in the MBTA's favor on the contract claim. We also agree that the evidence sufficiently raised the question of comparative negligence to warrant a jury instruction on that topic, and accordingly reverse the judgment on the negligence claim and remand the matter for a new trial.

*Background.*[3] On December 16, 1997, the plaintiff was working in a locked office at the MBTA's Quincy parking garage when an armed assailant gained entry to the booth and robbed him of a sum of money, severely injuring the plaintiff in the process. The plaintiff was employed by Kinney Parking of Suffolk County, Inc. (Kinney), which operated the garage pursuant to a lease agreement with the MBTA. The lease covered thirty-three separate parking garages and lots, and provided for payment of annual rent of $4,020,000, payable in weekly instal-

---

assertion that he was an intended beneficiary of certain provisions of the lease between the defendant and the plaintiff's employer, Kinney Parking of Suffolk County, Inc.

[2]We reject the MBTA's further claim that the attack on the plaintiff was not sufficiently foreseeable to present a question of fact for the jury's resolution. The question is not, as the MBTA attempts to frame it, whether the MBTA reasonably could foresee the precise circumstances of a robbery in the attendant's office, but whether a reasonable person in the MBTA's position might anticipate that a robbery or other criminal act might occur in the garage. The question was one of fact, and there was evidence to support the jury's conclusion that the prospect of a criminal act was foreseeable; indeed, the MBTA's insistence that it provide a security force for the garage suggests concern for just such a prospect. See *Mullins* v. *Pine Manor College,* 389 Mass. 47, 55 (1983). The MBTA does not dispute the sufficiency of the evidence to support a conclusion that it was negligent, or (other than as discussed below regarding comparative negligence) that its negligence was the proximate cause of the plaintiff's injuries.

[3]We furnish the salient background to frame the issues in dispute on appeal, reserving certain details of the evidence of comparative negligence for our discussion of that topic.

ments over a term of three years.[4] The lease also provided that the MBTA would supply security at fourteen transit facilities (of which the Quincy garage was one), and that Kinney would pay an additional $613,128 per year (in monthly instalments) as reimbursement for the cost of such security. Various other provisions of the lease addressed the parties' arrangement concerning security; as they are significant to our analysis of the plaintiff's contract claim, we discuss them in some detail.

The undertaking of the MBTA to supply security was set out in Exhibit E to the lease, captioned "PROFESSIONAL SECURITY"; we quote its provisions (excluding those addressing the amount and manner of payment) in their entirety in the margin.[5] Paragraph 6.9 of the lease required Kinney to "provide uniformed attendants . . . who shall act as a deterrent against vandalism and theft as provided for in Exhibit B. MBTA acknowledges that MBTA provides all professional security services for the Premises, . . . and [Kinney] is not responsible for the provision of professional security in the Premises." Exhibit D generally specified (among other topics) "hours of staffing & security minimum requirements"; paragraph 2 of that exhibit specified that "[a]ttendant(s) not required for booth coverage shall be deployed for traffic control at rush hours and shall function as a roving trash/security patrol at other times. Such security patrol obligation shall impose no liability on

---

[4]The lease specified the amount Kinney was to charge patrons for parking at each facility, subject to the right of the MBTA to amend such charges; if the charges increased, Kinney's rent was to increase based on a formula specified in the lease.

[5]"The MBTA Police Department ('Police') will supply security at the Group B Transit Facilities listed on Exhibit D. The services provided by the Police Department will consist of both uniformed patrol and plainclothes operations by Police Officers and/or Detectives. The Police will also provide mobile patrols and direct supervision of Officers and/or Detectives by MBTA Police Sergeants. MBTA Police Captains and/or Lieutenants who are unaffiliated management personnel will be provided to oversee the Transit Facility security program.

"The hours of police operations, the determination of whether the Officers will be uniformed or plainclothes, the locations of services provided and the rank of the Officers provided, regardless of union affiliation, will be at the sole discretion of the MBTA Chief of Police ('Chief').

"In addition to the above, the Police will procure services and security-related devices as deemed necessary by the Chief."

[Kinney] except to seasonably report to MBTA incidents exposing parked vehicles to theft or vandalism." Paragraph II.6 of Exhibit B specified that Kinney was to "conduct surveillance" and to "report by telephone and in writing . . . to the MBTA Police any damage or injury to any person or property in [*sic*] identifying whenever possible the person or persons who caused the damage or injury." Paragraph 6.17 of the lease required Kinney quarterly to "submit to the MBTA Chief of Police information . . . regarding the location and general nature of the assignments of any employees working for [Kinney] in connection with [the lease]." Finally, the last subparagraph of paragraph 8 of the lease provided that the MBTA would indemnify Kinney "to the extent of any liability of [Kinney] for MBTA's negligent acts or negligent failure to act arising directly out of MBTA's obligation to provide professional security under the terms of this Lease."[6]

Kinney entered into the lease with the MBTA after submitting the winning bid in response to the latter's request for proposals; the variable term among the competing submissions was the rent Kinney (and other bidders) proposed to pay, and neither the amount paid toward security costs, nor the other terms and conditions of the lease (including those addressing security), were the subject of negotiation.

*Third party beneficiary.* In order to prevail on a claim of breach of contract as a third party beneficiary, "the plaintiff must show that the defendant and the lessor intended to give [him] the benefit of the promised performance." *Anderson* v. *Fox Hill Village Homeowners Corp.*, 424 Mass. 365, 366 (1997). Massachusetts has adopted the Restatement (Second) of

---

[6]The plaintiff attaches significance to another provision of the lease, under paragraph II.5 of Exhibit B, which prohibited Kinney from conducting, or allowing any other person without an MBTA permit to conduct, any business on the premises. We view the provision as principally directed toward other business operations, including retail sales and food services, rather than security services. With or without reliance on paragraph II.5, however, we share the plaintiff's view that the lease established the MBTA as the exclusive security service for the premises, except as assisted by Kinney personnel in the manner described in the language quoted from Exhibit D and from paragraph II.6 of Exhibit B.

Contracts § 302 (1981).[7] See *Rae* v. *Air-Speed, Inc.*, 386 Mass. 187, 195 (1982). To ascertain the intention of the parties, "[w]e look at the language and circumstances of the contract. . . . The intent must be clear and definite" (citations omitted). *Anderson* v. *Fox Hill Village Homeowners Corp.*, *supra* at 366-367.

Like the present case, *Anderson* involved a lease that imposed obligations on a party to the lease, and a third party claiming that injury resulted from the failure of the party properly to perform such obligations.[8] The Supreme Judicial Court concluded without particular difficulty that the third party was no more than an incidental beneficiary and consequently could not recover under the lease. See *id.* at 367. We take the same view of the present case.

The plaintiff urges us to distinguish *Anderson* on the ground that the present lease designated separate consideration for the security services furnished by the MBTA, suggesting that "it is self-evident" that Kinney sought security services for the benefit of its employees. The distinction is unpersuasive. In light of the manner in which the lease terms were reached between the parties, it is evident that the payment for security services was separately stated because (unlike rent) it was a fixed sum, subject neither to variation among submissions by competing bidders nor to adjustment based on changes in revenues or other aspects of parking lot operation. Far from being "self-evident

---

[7]Restatement (Second) of Contracts § 302 (1981) provides:

"(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance. (2) An incidental beneficiary is a beneficiary who is not an intended beneficiary."

[8]The lease required that the tenant "promptly remove snow and ice from all driveways and walkways"; the third party, a nurse employed at a facility located on the leased premises, was injured when she slipped and fell on ice in the parking lot. *Anderson* v. *Fox Hill Village Homeowners Corp.*, 424 Mass. at 366.

that Kinney was retaining the professional security services of the MBTA for the purpose of protecting its interests," as matter of law we consider it clear from the language of the lease and the circumstances of its execution that the MBTA reserved to itself the responsibility for security services in order to control the parties' risk due to potential claims by third parties for loss resulting from property damage or personal injury at the leased facilities. While such a purpose necessarily anticipates the interests of such third parties in avoiding loss, the purpose of the arrangement is not to confer on such parties a right to enforce the contract but instead to allocate between the direct contracting parties the risk of loss, and control over factors affecting such risk.[9] Viewed in that manner, third parties who suffer a loss as a result of deficient security are not "intended beneficiaries" within the terms of the Restatement (Second), which looks in the first instance to whether "recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties." Restatement (Second) of Contracts § 302, *supra.* See also Restatement (Second) of Contracts § 307 (1981) ("Where specific performance is otherwise an appropriate remedy, either the promisee or the beneficiary may maintain a suit for specific enforcement of a duty owed to an intended beneficiary").[10]

---

[9]The plaintiff's contract claim similarly is not aided by the trial testimony of MBTA security officers that they considered security of the attendant's booth to be within the scope of their security responsibilities; such testimony simply establishes that the MBTA sought to reduce the risk of losses or injuries such as those which occurred in the present case, and not that it (or Kinney) intended the injured third parties to have a right of enforcement under their lease.

[10]We have previously noted commentary on the inherent difficulties in using "intention" as the Restatement (Second) attempts to do. See *Macksey* v. *Egan*, 36 Mass. App. Ct. 463, 469 n.13 (1994). As Professor Eisenberg has observed, contracting parties may well intend that a third party receive a benefit as a result of their contract but not intend to confer on the third party a right to enforce the contract. See Eisenberg, Third Party Beneficiaries, 92 Colum. L. Rev. 1358, 1381 (1992). Whatever may remain as difficulties in the formulation adopted by the Restatement (Second), we consider its most significant and helpful change from the first Restatement to be its shift in focus away from consideration of whom the contracting parties might have intended to receive a benefit as a result of their arrangement and instead to the effectuation of the parties' contractual objectives themselves, including the

Our conclusion, that the plaintiff is not an intended beneficiary of the provisions of the lease between Kinney and the MBTA concerning security, is also consistent with the results reached in similar cases in the vast majority of those jurisdictions that have had occasion to consider them. See *Bizien* v. *Port Authy. of N.Y. & N.J.*, 577 F. Supp. 1093 (E.D.N.Y. 1983) (airline employees injured during protest not intended beneficiaries of agreement between port authority and security company); *Storts* v. *Hardee's Food Sys., Inc.*, 919 F. Supp. 1513 (D. Kan. 1996) (restaurant patron abducted from parking lot not intended beneficiary of contract between restaurant and security company); *Tackett* v. *Merchant's Security Patrol*, 73 Ark. App. 358 (2001) (victim of automobile accident not an intended beneficiary of agreement between bar and security company); *Armor Elevator Co.* v. *Hinton*, 213 Ga. App. 27 (1994) (person injured in high-rise building not an intended beneficiary of contract between building operator and security company); *Hoisington* v. *ZT-Winston-Salem Assocs.*, 133 N.C. App. 485 (1999) (employee of shopping mall tenant injured while working not an intended beneficiary of agreement between mall owner and security company); *Hill* v. *Sonitrol of S.W. Ohio, Inc.*, 36 Ohio St. 3d 36 (1988) (injured employee not an intended beneficiary of agreement between employer and security company); *Rodriguez* v. *Philadelphia*, 657 A.2d 105 (Pa. Commw. Ct. 1995) (person murdered at YWCA not an intended beneficiary of lease requiring YWCA not to allow its guests to engage in improper conduct); *Esquivel* v. *Murray Guard, Inc.*, 992 S.W.2d 536 (Tex. Ct. App. 1999) (hotel patron whose car was stolen not an intended beneficiary of agreement between hotel and security company). Contrast *Locke* v. *Ozark City Bd. of Educ.*, 910 So. 2d 1247 (Ala. 2005) (umpire assaulted at high school baseball game was intended beneficiary of agreement between board of education and high school association requiring "good game administration" and "adequate police protection" at athletic events); *Wooldridge* v. *Echelon Serv. Co.*, 13 Va. Cir. 323 (1988) (employee killed in her office was intended

role a right of enforcement by a third party might play in effectuating such objectives. For further discussion of that perspective, see *id.* at 1385-1386.

beneficiary of agreement between her employer and security company).[11]

*Comparative negligence.* That the plaintiff is not an intended beneficiary, with rights to enforce the lease between Kinney and the MBTA, does not mean that the MBTA's contractual undertaking has no bearing on the legal duty owed by the MBTA to the plaintiff. For many years before recognizing contract rights of third party beneficiaries, our courts have considered express contractual obligations in determining whether a party owed a legal duty in support of a claim of negligence. See *Banaghan* v. *Dewey,* 340 Mass. 73, 80 (1959). As we observed above, see note 2, *supra,* the evidence was sufficient to support the jury's conclusion on the plaintiff's negligence claim that the plaintiff's injuries were a foreseeable consequence of the MBTA's failure adequately to perform its obligation to provide security. It remains to consider the MBTA's argument that the jury should have been instructed to assess the plaintiff's comparative negligence in accordance with G. L. c. 231, § 85.

The plaintiff testified at trial that he had been instructed by his superior to keep locked the door to the office in which the plaintiff was working at the time of his attack, and that he was not to allow strangers to enter the office. There was also evidence (in the form of the plaintiff's initial statement to police) that, at the time he opened the office door to his assailant, the plaintiff believed the person to be a "customer," and that after admitting his assailant to the office he initially resisted the intruder's directive to open the safe before being struck in the head with the intruder's revolver.[12] Though the plaintiff's trial testimony presented a different version of events,[13] when viewed in the light most favorable to the defendant, see *Mullins*

---

[11]Of the cited jurisdictions, all but Georgia and Texas have either expressly adopted the Restatement (Second) of Contracts § 302 or cite it in support of their analysis. Third party beneficiary status in Georgia is governed by statute, Ga. Code Ann. § 9-2-20(b) (2005), while Texas continues to follow Restatement of Contracts § 133 (1932).

[12]The plaintiff's statement to police (to which the plaintiff did not object at trial) was admissible as substantive evidence as the statement of a party-opponent. See Liacos, Brodin, & Avery, Massachusetts Evidence § 8.8 (7th ed. 1999).

[13]The plaintiff testified that he saw a coworker through the window of the office door, but that when he opened the door to admit the coworker, two ad-

v. *Pine Manor College*, 389 Mass. 47, 56 (1983), a rational jury could have found that the plaintiff opened the door to admit a stranger, in violation of his supervisor's instructions; that that act was negligent; and that that negligence contributed to the causation of his injuries. The MBTA was entitled to its requested jury instruction, and its omission entitles the MBTA to a new trial on the plaintiff's negligence claim.[14]

*Conclusion.* The judgment on the plaintiff's contract claim is vacated, and a new judgment shall enter dismissing the claim. The judgment on the plaintiff's negligence claim is reversed, and the matter is remanded for a new trial.

*So ordered.*

---

ditional men (who had been hidden from his view behind the coworker) entered the office and committed the robbery.

[14]During the parties' argument to the trial judge on the MBTA's request for instruction, the MBTA did not mention the plaintiff's statement to police or challenge the plaintiff's assertion that the only relevant evidence was the plaintiff's unequivocal trial testimony that he opened the door to admit a coworker.