#25710-rev & rem-JKM

**2011 S.D. 50**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ALFRED JENNINGS, DALE HAYFORD,
ROMAN ROBERTS, RICK FARLEY,
TODD CARLSON, CLAY ROSE, LEONARD
FEIST, KASEY COFFIELD, STANLEY
FEDERKIEWICZ, WILLIAM MAY, DICKIE
KAISER, DEAN SORENSON, ROBERT
KOSKI, MARY GEERSMA, CHARLES
EDWARDS, DONALD BERTALOT, LYNN
SHUCK, SUSAN BURNISON, KELVIN
KIEL, CHARLES SWANSON, CHARLOTTE
WARD and KENNETH MERNAUGH,                    Plaintiffs and Appellants,

v.

RAPID CITY REGIONAL HOSPITAL, INC.,
REGIONAL HEALTH NETWORK, INC., and
REGIONAL HEALTH PHYSICIANS, INC.,            Defendants and Appellees.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE RANDALL L. MACY
Judge

\* \* \* \*

ARGUED FEBRUARY 16, 2011

OPINION FILED **08/24/11**

REED C. RICHARDS of
Richards and Richards
Spearfish, South Dakota

and

STEVEN M. CHRISTENSEN
Deadwood, South Dakota

Attorneys for plaintiffs
and appellants.

DANIEL G. DUFFY
JEFFREY G. HURD of
Bangs, McCullen, Butler,
Foye & Simmons, LLP
Rapid City, South Dakota

Attorneys for defendants
and appellees.

#25710

MEIERHENRY, Retired Justice.

[¶1.]      Plaintiffs (Employees) were all formerly employed by Pope & Talbot, a lumber business located in Spearfish, South Dakota. Pope & Talbot self-insured a health benefits plan for Employees, their spouses, and dependents. This plan was partially paid for by deductions from Employees' paychecks. In January 2000, Pope & Talbot entered into a contract (Payer Agreement) with First Choice of the Midwest (FCM), a managed care organization, to administer a self-insured health plan. FCM managed healthcare services by establishing a Preferred Provider Organization Network (PPO Network). In March 1998, FCM contracted with Rapid City Regional Hospital System (Regional) to participate in the PPO Network (Hospital Agreement).[1] Under the Agreements, Regional would submit claims to FCM for healthcare services provided to Pope & Talbot Employees. FCM then would process the claims to determine coverage and provider rates and forward the processed claims to Pope & Talbot for payment. Payer Agreement § 2.08; Hospital Agreement § 5.03. Both Agreements provided that "members" (in this case Pope & Talbot Employees) were "[e]xcept as otherwise permitted under applicable law . . . not liable for any charges for Healthcare Services that are Covered Services." Payer Agreement § 2.11; Hospital Agreement § 5.05.

[¶2.]      In November 2007, Pope & Talbot filed for Chapter 11 reorganization bankruptcy. Pope & Talbot continued to take payroll deductions from Employees

---

1.    The Hospital Agreement and Payer Agreement will collectively be referred to as the "Agreements."

for medical coverage after filing bankruptcy, but stopped paying Regional for some of the covered charges. In May 2008, Pope & Talbot sold the lumber company and stopped making any payments owed under the health plan. Regional's collection agencies then directly billed Employees for services that should have been paid by Pope & Talbot under the Agreements.

[¶3.]    Employees filed suit to stop Regional's attempts to collect payment from them for services that were covered by Pope & Talbot's benefit plan. Employees sought relief under the following theories: declaratory judgment, injunction, breach of contract, negligent infliction of emotional distress, and bad faith breach of contract. Regional counterclaimed for a declaratory judgment that "[Employees] are obligated to pay for the care rendered by [Regional]."

[¶4.]    Employees moved for partial summary judgment on their breach of contract claim. Employees argued that the Hospital and Payer Agreements prohibited Regional from collecting covered medical care charges directly from the Employees because those charges were Pope & Talbot's obligation. Payer Agreement § 2.11; Hospital Agreement § 5.05. Regional moved for summary judgment on all of Employees' claims because "there [were] no disputed issues of material fact regarding [Employees'] obligation to pay [Regional] for the healthcare services provided." At the summary judgment hearing, Regional argued to the circuit court that Employees were not third-party beneficiaries under either the

Payer Agreement or Hospital Agreement and were therefore unable to assert any protection under the Agreements.[2]

[¶5.] The circuit court granted summary judgment in favor of Regional on all of Employees' claims and denied Employees' motion for partial summary judgment. The court found that "nothing in these contracts relieves [Employees] from paying for medical services if the self-insured employer fails to pay the provider." We reverse and remand.

## Analysis

***Employees are third-party beneficiaries of both Agreements.***

[¶6.] The first issue is whether Employees have standing as third-party beneficiaries to enforce the provisions of the two contracts: (1) the Payer Agreement between Pope & Talbot and FCM, and (2) the Hospital Agreement between FCM and Regional. If Employees are third-party beneficiaries of the Agreements, they have standing to use the Agreements to challenge Regional's attempt to collect for covered medical services left unpaid by Pope & Talbot. Resolution of the issue is a matter of law, which we review de novo. *Masad v. Weber*, 2009 S.D. 80, ¶ 10, 772 N.W.2d 144, 149.

---

2. In its "Statements of Material Fact in Support of Motion for Summary Judgment," Regional stated for the first time that Employees have independent contracts with Employees that purportedly allow Regional to bill Employees directly. These "independent contracts" are Consent to Treatment and Conditions of Admission forms signed by Employees when they received healthcare services from Regional. At oral argument, Regional stated that it was seeking payment from Employees under these consent forms, but not as a part of this proceeding.

[¶7.] The circuit court found that Employees were not third-party beneficiaries of the Hospital Agreement and the Payer Agreement. The circuit court explained that the Agreements must be read as a whole and that "[Employees] may have had the benefit of third-party status if [Regional] would have received payment from Pope [and Talbot] and [Regional] then tried to balance bill the [Employees]." The circuit court viewed payment by Pope & Talbot as a condition precedent of the Hospital Agreement, which, if paid, would have required Regional to accept the discounted payment in exchange for the services provided. Under the circuit court's reasoning, Pope & Talbot's failure to pay entitled Regional to bill Employees for the full cost of services provided.

[¶8.] The circuit court's characterization of Pope and Talbot's payment as a condition precedent is misplaced. We have said:

> A condition precedent is a contract term distinguishable from a normal contractual promise in that it does not create a right or duty, but instead is a limitation on the contractual obligations of the parties.

> A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance. . . . A condition is distinguished from a promise in that it creates no right or duty in and of itself but is merely a limiting or modifying factor. . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence.

*Johnson v. Coss*, 2003 S.D. 86, ¶ 13, 667 N.W.2d 701, 705-06 (citing 13 Richard A. Lord, Williston on Contracts, § 38:1 (4th ed. 2000)).

[¶9.] Additionally, we have noted that "courts generally will interpret conditions as stipulations rather than conditions precedent that could trigger forfeiture." *Weitzel v. Sioux Valley Heart Partners*, 2006 S.D. 45, ¶ 38, 714 N.W.2d

884, 895. The Agreements in this case do not reflect the intent to create a condition precedent. Pope & Talbot's agreement to pay can only be viewed as a promise. Failure to pay may constitute a breach of the contract but does not render the contract unenforceable or automatically discharge benefits to third parties. *Id.*

[¶10.]     Under South Dakota law, "[a] contract made expressly for the benefit of a third person may be enforced by him at any time before the parties thereto rescind it." SDCL 53-2-6. We have stated that a purported third-party beneficiary "must clearly show that [the contract] was entered into with the intent on the part of the parties thereto that such third party should be benefited thereby." *Sisney v. Reisch,* 2008 S.D. 72, ¶ 9, 754 N.W.2d 813, 817-18. *See also Sisney v. State*, 2008 S.D. 71, ¶ 10, 754 N.W.2d 639, 643. To determine the parties' intent, we first look at the language of the contract.[3] *Reisch*, 2008 S.D. 72, ¶ 9, 754 N.W.2d at 818. "The terms of the contract must clearly express intent to benefit that party or an identifiable class of which the party is a member. . . . This intent might in a given case, sufficiently appear from the contract itself." *Id.*

[¶11.]     In this case, the contract language clearly expresses intent to benefit the employees of Pope & Talbot. The Agreements are part of the managed care arrangement and contain similar and, in some instances, identical language when referring to "members" covered under the Agreements. By the terms of the

---

3.    Regional provided affidavits by employees of FCM & Regional as support that Employees were not intended to be third-party beneficiaries. These affidavits are not persuasive because they do not indicate the affiants' intent at the time the contract was made, but rather their intent after litigation had commenced. Furthermore, the determination of third-party beneficiary status is a question of law.

#25710

Agreements, the parties acknowledge they are part of a "contractual relationship" to "provide" medical services for eligible employees or "obtain access" to the services for eligible employees. The terms of the Payer Agreement between Pope & Talbot and FCM explicitly state the purpose of the contract is to provide healthcare services for its employees through the PPO Network. It recites as follows:

> Whereas, Payer exercises discretionary authority to control respecting management and administration of one or more Employer's Health Benefits Plan(s) which are offered to eligible employees, their dependents, and other eligible beneficiaries ("Members");
>
> Whereas FCM is organized for the purpose of coordinating Healthcare Services through the establishment of a Preferred Provider Organization ("PPO") Network comprised of Physicians, Hospitals and other Healthcare Providers, whose services may be accessed by Payers on behalf of their Members after entering into an Agreement to obtain such access;
>
> Whereas, FCM and Payer intend to enter into a contractual relationship whereby Payer obtains for its Members access to FCM's PPO Network.

The Hospital Agreement between FCM and Regional also expresses the parties' intent to provide healthcare services to employees through contracts with employers. The recitals in the agreement provide:

> Whereas, FCM is organized for the purpose of coordinating healthcare services through the establishment of a Preferred Provider Organization ("PPO") Network and through its current and anticipated contracts with employer groups, insurance carriers, and third party administrators who may obtain access to the PPO Network for their Members;
> . . .
> Whereas, FCM and Hospital intend to enter into a contractual relationship whereby Hospital will provide Healthcare Services to Members who are entitled to utilize the medical resources of the PPO Network.

-6-

Both Agreements define "Members" as "any current or former employee and/or dependent who meets the eligibility requirements under an applicable plan." Hospital Agreement § 1.12; Payer Agreement § 1.12. There is no dispute that Employees were "Members" under the Agreements. The recitals in the Agreements clearly express an intent to benefit Employees.

[¶12.] Regional asserts, however, that although Employees benefit, that was not the primary purpose of the Agreements. Specifically, Regional argues that "the primary purpose of the Hospital Agreement was to benefit FCM by making its PPO Network more attractive to health plans, to benefit Pope & Talbot with reduced healthcare costs, and to provide Regional with a larger patient pool." Employees respond that the primary purpose of the Agreements is to benefit them by providing health services. We have said that a third-party beneficiary must show "that the contract was entered into by the parties directly and primarily for his benefit." *Masad*, 2009 S.D. 80, ¶ 18, 772 N.W.2d at 154. It is not necessary for Employees to show that no other party has benefited from the contract. It may be true that Regional, FCM, and Pope & Talbot did benefit from the Agreements. But for the Employees, however, they would not have entered into the Agreements. We look only at who was directly and primarily benefited. *See id.* In this case, it is Employees.

[¶13.] Regional argues that Employees are only incidental beneficiaries similar to the situation in *Masad,* 2009 S.D. 80, ¶ 18, 772 N.W.2d at 154. But *Masad* is distinguishable. In *Masad*, an employee of a catering company was attacked by an inmate while working in the prison kitchen. The catering company

had a contract with the penitentiary to provide food services for the inmates. The contract also included security provisions. Masad argued that he was a third-party beneficiary to the contract. This Court held that any benefit to Masad was only indirect. *Id.* ¶ 24. "The primary purpose of the contract was to provide food services for the prisoners in the custody of the State." *Id.*

[¶14.] Employees in this case are not in Masad's position but more in the position of the third-party beneficiary in *Reisch*, 2008 S.D. 72, 754 N.W.2d 813. In *Reisch*, we held that an inmate was a third-party beneficiary of an agreement between the Department of Corrections and a former inmate to provide kosher food for Jewish inmates. *Id.* ¶ 10. The agreement in that case was to provide a kosher diet "to all Jewish inmates who request it."[4] Since the intent of the contract was to provide kosher food to Jewish inmates, Sisney, as a Jewish inmate, was a third-party beneficiary to the agreement. Like Sisney, Employees are part of an identifiable group, i.e., "Members" under the plan. The intent of the Agreements was to provide medical services to Members. Accordingly, Employees are third-party beneficiaries. Consequently, Employees have standing to enforce the Agreements.

[¶15.] The circuit court also determined that Employees' eligibility as "Members" ceased in November 2007 when Pope & Talbot filed for bankruptcy. The record does not indicate that FCM, Regional, or Pope & Talbot terminated either Agreement at that time or that the bankruptcy proceedings dealt with this issue. In

---

4. *Reisch* is distinguishable from *Sisney* because the contract in *Sisney* was a public contract that did not expressly indicate it was made for the benefit of Sisney. *Sisney,* 2008 S.D. 71, ¶¶ 11-13, 754 N.W.2d 639, 644.

fact, Pope & Talbot continued to take deductions out of Employees' paychecks for the self-insured plan after filing for bankruptcy.

[¶16.] Furthermore, the Agreements both contain "Continuation of Obligations" clauses addressing reimbursement in the event of termination of the Agreement. Hospital Agreement § 6.04; Payer Agreement § 6.04. Although the language is slightly different, both clauses indicate that the Payer (Pope & Talbot) or "Plans or Administrators" shall reimburse any participating provider for covered services received before termination of the plan. *Id.* Therefore, the bankruptcy filing did not terminate the contract arrangement established by the Agreements. Actually, counsel indicated in their briefs and at oral argument that Employees received services before and after the bankruptcy filing. But no services were provided after Pope & Talbot sold the business in May 2008. Thus, all the services at issue were provided before the arrangement was terminated by the sale. The circuit court ruling that Employees are responsible for any covered services provided after the bankruptcy filing is not supported by the record.

***Employees are not obligated to pay for covered medical services under the Agreements.***

[¶17.] The next question is whether the terms of the Agreements allow Regional to charge Employees for the cost of covered services that Pope & Talbot should have paid. Neither Agreement addresses what happens if the "payer," Pope & Talbot, fails to pay. Additionally, nothing in either Agreement gives Regional the right to bill Employees directly for covered services. But identical provisions in the Hospital Agreement and the Payer Agreement provide:

> *Except as otherwise permitted under applicable law, Members shall not be liable for any charges for Healthcare Services that are Covered Services.* This provision shall not prohibit collection of supplemental charges or copayments by Provider. To the extent permissible under applicable law, Provider may bill Member directly for non-covered services, Deductibles and Copayments, and for services rendered after a Member's eligibility has ceased. In no event shall FCM be responsible for any amount of money owed by the member to Provider in the event that Providers are unable to collect such amount of money from the Member.

Hospital Agreement § 5.05; Payer Agreement § 2.11 (emphasis added).[5] The plain

meaning of this provision is that the Employees cannot be charged for covered

---

5.  While the dissent is correct that generally the "failure of the promisee to perform a return promise ordinarily discharges the promisor's duty to a beneficiary to the same extent that it discharges his duty to the promisee," it is not applicable here. *See* dissent ¶ 33. While the promisor's duty to the beneficiary may be discharged, that discharge cannot create an obligation for the beneficiary. In other words, the inability of a third party beneficiary to receive a benefit because the promisee breached the contract with promisor does not mean that the beneficiary incurs the promisee's liability under the contract. As Prof. E. Allan Farnsworth explained, "the beneficiary is subject to recoupment of any claims of the promisor for damages for breach of contract by the promise. The claim is only good against the beneficiary *to the extent that it extinguishes the beneficiary's claim*; *it cannot be used to impose liability on the beneficiary.*" E. Allan Farnsworth, Contracts § 10.9, Vulnerability of Beneficiary to Defenses and Claims 676 (4th ed. 2004) (emphasis added). By the nature of being a beneficiary, it is only possible to benefit from the contract, not be harmed by it. While factually distinguishable, this Court upheld this principle in *First Dakota National Bank v. Performance Engineering & Manufacturing, Inc.*, 2004 S.D. 26, 676 N.W.2d 395. In that case, we stated:

> A third-party beneficiary is one who is given rights under a contract to which that person is *not* a party. Obligations under such a contract, including any obligations to third parties, are created by agreement between the *signatories* . . . If the signatories so intend, a third party can enforce the contract against the signatory so obligated. But the third-party beneficiary, who did not sign the contract, is not liable for either

(continued . . .)

-10-

services.  The only way they could be charged for covered services would be if some "applicable law" permitted it.  Regional did not provide the circuit court or this Court with a law that would apply to these circumstances.

[¶18.]        The Agreements make Pope & Talbot, as a self-insured employer, solely liable for covered services.  Section 1.15 of both the Payer Agreement and Hospital Agreement state: "Payer shall refer to an organization which purchases Healthcare Services on behalf of individual members pursuant to a health benefits plan and which is, therefore, *responsible for the payment of Covered Healthcare Services to Members*."  (Emphasis added.)  The Agreements allowed Pope & Talbot to pay a discounted rate for covered services after receiving a bill from Regional via FCM.  Regional understood from the Hospital Agreement that they would be getting paid by Pope & Talbot, not Employees, for "covered services."  Because Regional knew the payments would be coming from Pope & Talbot, Regional bore the risk of Pope & Talbot's failure to pay.  Furthermore, Employees had deductions from their paychecks to contribute to Pope & Talbot's self-insured plan.  Under the arrangement established by the Agreements, if Regional was allowed to bill Employees for their services, Employees would effectively be paying for their health services twice.

------

(. . . continued)
        signatory's performance and has no contractual obligations to either.

    *Id.* ¶ 8, 676 N.W.2d at 399 (quoting *Motorsport Eng'g, Inc. v. Maserati SPA*, 316 F.3d 26, 29 (1st Cir. 2002)).

[¶19.]     In conclusion, Employees are intended third-party beneficiaries of the Agreements and therefore have standing to enforce the Agreements. The plain language of the Agreements specifically states that Members are not liable for covered services. Regional has not provided any argument that overcomes this plain language. Pope & Talbot's failure to pay for Employees' covered services does not pass the obligation to the Employees, who have already contributed to their health plan. Regional's recourse under the Agreements is against Pope & Talbot, not the Employees.

### *Whether the "Consent to Treatment and Conditions of Admission" Forms are contracts of adhesion is not properly before this Court.*

[¶20.]     The parties attempt to interject the issue of whether Regional's "Consent to Treatment and Conditions of Admission" forms were contracts of adhesion. This issue, however, was not actually raised or addressed below. The circuit court merely noted in its memorandum decision that Regional has "separate contracts with [Employees] for payment of [m]edical [s]ervices. These separate contracts 'Consent to Treatment and Conditions of Admission' make [Employees] responsible for non-covered charges." Non-covered charges, however, were not an issue. The circuit court pointed out that Employees could raise adhesion as an affirmative defense, but that Regional was not seeking to enforce the Consent Forms or "collect for unpaid medical bills in this lawsuit." Regional admitted at the summary judgment hearing that it was not attempting to collect in this case, that was "a separate issue." *See supra* note 2. Because Regional was not seeking payment under the Consent Forms in this action and because the parties did not raise issues of adhesion or enforceability of the Consent Forms in the pleadings or

otherwise, the circuit court was correct in declining to rule on the Consent Forms. The issues were not properly before the circuit court nor ripe for review. Thus, we decline to address any issues related to the Consent Forms. And, contrary to the dissent's statement that today's decision "enjoins Regional from pursuing payment of its bills," we express no opinion on the effect this case may have after remand on an effort by Regional to seek payment under the Consent Forms. *See* dissent n.8.

### Conclusion

[¶21.]    Employees are third-party beneficiaries of the Agreements and have standing to enforce the Agreements. Under the language and arrangement of the Agreements, Employees are not responsible for the cost of covered services. We reverse and remand for the circuit court to address Employees' other causes of action.

[¶22.]    GILBERTSON, Chief Justice, and SEVERSON, Justice, concur.

[¶23.]    ZINTER, Justice, concurs with a writing.

[¶24.]    KONENKAMP, Justice, dissents.


ZINTER, Justice (concurring).

[¶25.]    I join the opinion of Justice Meierhenry. Although I agree with many of the legal principles discussed in the dissent, I join the majority writing because it appears that the Agreements the employees sought to enforce as third-party beneficiaries were not terminated before Regional provided the medical services at issue.

[¶26.] The dissent agrees that Regional "was limited to accepting 'payment as provided in this Agreement as payment in full' for covered services." *See infra* ¶ 32 (quoting agreement). Indeed, both Agreements explicitly provided that the employee members were "[e]xcept as otherwise permitted under applicable law . . . not liable for *any charges* for Healthcare Services that are Covered Services." *See supra* ¶ 17 (quoting § 2.11 of the Payer Agreement and § 5.05 of the Hospital Agreement) (emphasis added). The dissent, however, concludes that because Pope & Talbot "defaulted" on its payments, Regional's limitation on billing employees was discharged by Pope & Talbot's "breach." *See infra* ¶¶ 32, 33-35, 37. Similarly, the circuit court ruled that Regional was not prohibited from billing employees after their "eligibility for services ceased," which the circuit court determined occurred when Pope & Talbot filed for bankruptcy in November 2007. Thus, the dissent and the circuit court reason that upon breach (the dissent) or bankruptcy (the circuit court), the agreements automatically terminated thereby eliminating employees' ability to enforce the contracts. Both opinions further assume that the medical services at issue were provided after termination of the Agreements. In my view, the record does not support either assumption.

[¶27.] With respect to termination, Justice Meierhenry points out that there is no evidence that FMC or Regional terminated either Agreement in the bankruptcy or otherwise. *Supra* ¶ 15. This observation is well supported because the Agreements did not automatically terminate upon breach or bankruptcy. § 6.03 of Regional's contract only gave Regional the conditional right to terminate for a material breach if not corrected within thirty days of written notice of such breach.

The record does not, however, reflect that Regional ever terminated the contract in accordance with the written notice and grace period requirements. Moreover, the record does not indicate that the contracts were terminated in the November 2007 bankruptcy because some medical services were paid for under the plan through April 2008. Thus, the record does not support the assumption that the Agreements were terminated before Pope & Talbot was sold in May of 2008.

[¶28.] This is significant because even though Regional knew Pope & Talbot was not paying, and even though Regional knew it could terminate the Agreements thirty days after a breach, Regional continued to provide medical services without terminating the Agreements. Thus, a substantial number of the medical services were provided before the November 2007 bankruptcy (some as early as September 7, 2006) and some were provided as late as May 2008. And although there is no dispute that Pope & Talbot was sold in May 2008, the record does not reflect that any services were provided after May 30, 2008. Finally, even if there had been a termination of the Agreements, § 6.04 required Regional to provide services for the period necessary to conclude any hospitalizations existing on the date of termination or until the patient could be safely and reasonably referred.

[¶29.] Because the contracts did not automatically terminate, and because Regional continued to provide the medical services at issue without terminating the contracts, the contracts restricting Regional's right to seek payment from the employees remained in effect for the medical services involved in this case. And until the Agreements were terminated, the employees were entitled the benefit of

the Agreements as third-party beneficiaries.  I therefore join the opinion of the Court.


KONENKAMP, Justice (dissenting).

[¶30.]	Plaintiffs, the employees of Pope & Talbot, are suing Rapid City Regional Hospital seeking, first, an injunction precluding the hospital from collecting for the medical services it provided to the employees and, second, compensatory and punitive damages against the hospital in attempting to collect its unpaid bills.  The employees do not deny they received these medical services, but contend that because Pope & Talbot entered into a self-insured medical care plan, making the employees not liable for covered services under the plan, that as third party beneficiaries, they cannot be held financially responsible for their medical bills.  The problem is that after Pope & Talbot went bankrupt and was sold, it ceased paying for its employees' medical bills.  With Pope & Talbot having defaulted on its obligation to pay under its self-insured plan, can the employees be held financially responsible?

[¶31.]	Two contracts bear on this question: Pope & Talbot's Payer Agreement with FCM and FCM's Participating Hospital Agreement with Regional.  With respect to employee liability, the Payer Agreement states: "Except as otherwise permitted under applicable law, [the employees] shall not be liable for any charges for [covered healthcare services]."  In the same vein, the Participating Hospital Agreement provides: "Hospital agrees to accept payment as provided in this Agreement as payment in full for [covered healthcare services] rendered to each

-16-

[employee] and shall not bill [an employee] for any *balance* between Hospital's billed charges and the applicable reimbursement rate to which Hospital is entitled under this Agreement." (Emphasis added.)  These agreements form Pope & Talbot's self-insured health care plan.

[¶32.]     Typically, managed care agreements contain a hold harmless provision preventing hospitals from seeking payment from the enrollees for covered medical services, when the payer organization fails to pay for these services or goes bankrupt.[6]  But no such provision can be found in the two agreements here, and the employees have never contended that South Dakota law prohibits collection directly from them.[7]  The employees rely solely on the two contracts to define their rights. Under these contracts, Regional was limited to accepting "payment as provided in this Agreement as payment in full" for covered services.  The difficulty being, of course, that Regional did not receive payment "as provided in this Agreement."  The payer, Pope & Talbot, defaulted.

---

6.     Collette B. Resnik, *Maxicare as a Guide for Health Maintenance Organizations (HMOs) in Bankruptcy*, 8 Bankr. Dev. J. 271, 281 (1991).  Most states require "hold harmless" provisions in managed health care plans similar if not identical to the one adopted in the Health Maintenance Organization Model Act, promulgated by the National Association of Insurance Commissioners (NAIC).  *See Samsel v. Allstate Ins. Co.*, 59 P.3d 281, 288-89 (Ariz. 2002).

7.     South Dakota prohibits a managed care provider from collecting or attempting to collect from a covered person any money owed to the provider by a health carrier.  SDCL 58-17C-14(2) (repealed and transferred to SDCL ch. 15-17).  In oral argument, counsel for Regional said that this prohibition does not apply in this case, and the employees have not raised this issue before the circuit court or argued it before us.  "Generally, failure to raise an issue below will preclude appellate review."  *In re B.Y. Dev., Inc.*, 2000 S.D. 102, ¶ 17, 615 N.W.2d 604, 611 (citations omitted).

[¶33.] Accordingly, even if we assume that Pope & Talbot's employees are third party beneficiaries, the employees cannot enforce Regional's performance as if Pope & Talbot had continued to honor its contractual obligations. As third party beneficiaries under Pope & Talbot's self-insured plan, the employees stand in the shoes of Pope & Talbot, and "failure of the promisee to perform a return promise ordinarily discharges the promisor's duty to a beneficiary to the same extent that it discharges his duty to the promisee." Restatement (Second) of Contracts § 309 cmt. b; *see also Souza v. Westlands Water Dist.*, 38 Cal. Rptr. 3d 78, 91 (Cal. Ct. App. 2006).

[¶34.] As counsel for the employees explained, the employees "are asking this Court to enforce . . . the Regional contract by prohibiting it from attempting to collect from [the employees] those payments owed by Pope & Talbot to Regional for medical services rendered under contracts herein." Thus, they seek enforcement of the "shall not be liable for any charges" provision. But only if Pope & Talbot had the right to enforce performance from Regional, would the employees have the right to require Regional to refrain from collecting its bills directly from the employees. *See Votaw Precision Tool Co. v. Air Canada*, 131 Cal. Rptr. 335, 337 (Cal. Ct. App. 1976) (promisee breached contract, alleged beneficiary cannot enforce contract against promisor); *see also BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 697 (2d Cir. 1993); *Kinne v. Lampson*, 364 P.2d 510, 512 (Wash. 1961).

[¶35.] The crux of this case is Pope & Talbot's failure to pay. In addressing this issue, the Court writes: "Failure to pay may constitute a breach of the contract but does not render the contract unenforceable or automatically discharge benefits

to third parties." To support this holding, the Court cites *Weitzel v. Sioux Valley Heart Partners*, 2006 S.D. 45, 714 N.W.2d 884. *Weitzel* is inapplicable. First, it was not a third party beneficiary case. Second, the suggestion that failure to pay may not excuse performance was made in connection with applying the prevention doctrine. This case has nothing to do with that doctrine. Here, Pope & Talbot breached the contract when it failed to pay. And Regional would be entitled to raise any claims or defenses against the employees that it could have raised against Pope & Talbot. *See Oman v. Yates*, 422 P.2d 489, 495 (Wash. 1967) (promisee's breach of the contract was a defense available to promisor on action by third party beneficiary); *see also* Restatement (Second) Contracts, § 309; *Souza*, 38 Cal. Rptr. 3d at 91; *State v. Osborne*, 607 P.2d 369, 371 (Alaska 1980). As Professor Farnsworth explains:

> Since an intended beneficiary's right is based on the contract between the promisor and the promisee, it is measured by the terms of that contract and is generally subject to any defenses and claims of the promisor against the promisee arising out of the contract.

E. Allan Farnsworth, Contracts § 10.9, Vulnerability of Beneficiary to Defenses and Claims, 772 (2d ed. 1990).

[¶36.] To stress the point, had Pope & Talbot brought an action to enforce the contracts seeking to require Regional to provide its contractually agreed medical services to Pope & Talbot's employees, it is obvious the action would have no merit: Pope & Talbot's failure to pay would excuse Regional's duty to perform. *See Osborne*, 607 P.2d at 371; *see also Rae v. Air-Speed, Inc.*, 435 N.E.2d 628, 633 (Mass. 1982) (beneficiary's recovery is limited to amount beneficiary could have recovered

-19-

had promisee performed under the contract). But Regional did perform. Thus, contrary to the Court's conclusion that "the employees cannot be charged for covered services," Regional may still seek payment for those services from the employees, under the individual agreements each signed upon hospital admission, subject to the employees' defenses that these are contracts of adhesion. [8] Being third party beneficiaries does not elevate the employees to a protected status, immunizing them from liability. On what conditions and in what amounts Regional may obtain payment remains to be decided in a separate lawsuit.

[¶37.] The Court incorrectly contends that this dissent would create an obligation for the employees under these health care contracts. It claims that Pope & Talbot's self-insured medical plan cannot harm the employees, and that "the inability of a third party beneficiary to receive a benefit because the promisee breached the contract with the promisor does not mean that the beneficiary incurs the promisee's liability under the contract." In no way is it being suggested here that the two health care contracts themselves create liability for the employees. Nor is Regional making such a claim. Rather, because Pope & Talbot breached its duty to pay under its self-insured agreement, Regional is not precluded from seeking payment under the individual contracts the employees signed.

---

8.    The Court claims that it is not reaching the question of enforceability of these Conditions of Admission agreements, but its decision today effectively enjoins Regional from pursuing payment of its bills under these agreements. Regional's Consent to Treatment and Conditions of Admission form provides: "The undersigned agrees, whether as agent or as patient, that in consideration of the services to be rendered to the patient, he/she individually obligates himself/herself to pay the account of the Hospital in accordance with the rates and policies of the Hospital."

[¶38.]     Regional provided Pope & Talbot's employees and their dependents with medical services for which Regional has not been paid.  In accord with the contract terms, Regional agreed to "accept payment as provided in this Agreement as payment in full" for covered healthcare services.  Since Regional was not paid by Pope & Talbot, Regional cannot be held to the terms of the agreement.[9]  Summary judgment should be affirmed.

---

9.     Justice Zinter's writing assumes that Regional would have no recourse against the employees upon Pope & Talbot's failure to pay until after notice of termination of the medical care contracts.  *Cf*. SDCL 58-17C-14(2).  But these contracts only bound Regional to accept the "applicable reimbursement rate" as payment in full, not to waive all payments in the event Pope & Talbot paid nothing.