#29307-a-SRJ
**2021 S.D. 37**

# IN THE SUPREME COURT
## OF THE
## STATE OF SOUTH DAKOTA

\* \* \* \*

| | |
|---|---|
| ROBERT WILSON AND SHARLENE WILSON, Husband and Wife, | Plaintiffs and Appellants, |

v.

| | |
|---|---|
| RORY MAYNARD AND KRISTEN MAYNARD, Husband and Wife, | Defendants and Appellees, |

\* \* \* \*

## APPEAL FROM THE CIRCUIT COURT OF
## THE FOURTH JUDICIAL CIRCUIT
## LAWRENCE COUNTY, SOUTH DAKOTA

\* \* \* \*

## THE HONORABLE MICHELLE K. COMER
Judge

\* \* \* \*

| | |
|---|---|
| LONNIE R. BRAUN of Thomas, Braun, Bernard & Burke, LLP Rapid City, South Dakota | |
| DWYER ARCE of Kutak Rock, LLP Omaha, Nebraska | Attorneys for plaintiffs and appellants. |
| STEVEN J. MORGANS of Myers Billion, LLP Sioux Falls, South Dakota | Attorneys for defendants and appellees. |

\* \* \* \*

CONSIDERED ON BRIEFS
NOVEMBER 16, 2019
OPINION FILED **06/16/21**

#29307

JENSEN, Chief Justice

[¶1.] Rory and Kristen Maynard (Maynards) built a home in a residential development near Deadwood, South Dakota, and rented the home to short-term guests. The owners of an adjacent property, Robert and Sharlene Wilson (Wilsons), sued Maynards alleging that Maynards violated restrictive covenants limiting use of properties in the development to "residential purposes." The circuit court granted summary judgment in favor of Maynards, holding that short-term rentals were a residential purpose, and denied Wilsons' request for injunctive relief. We affirm.

## Facts and Procedural History

[¶2.] In the early 1990s, Jon Mattson purchased a 160-acre tract of land near Deadwood, South Dakota. He divided the land into 33 lots and created a residential development called Shirt Tail Gulch subdivision. In 1997, Mattson established a declaration of restrictive covenants (Covenants), which were filed with the Lawrence County Register of Deeds, for purchasers of Lots 1 to 31 in the subdivision. The stated purpose of the Covenants was for "creating and keeping the above described property, insofar as possible, desirable, attractive, free from nuisance . . . for the mutual benefit and protection of the owners of all lots, and the surrounding and adjacent property."

[¶3.] Among the Covenants' 32 provisions, the provision central to this case states:

> No lot may be used except for residential purposes, which shall include normal home occupations and offices of recognized professions and bed and breakfast uses allowed under State and County laws and regulations.

Another provision states that "[a]ll construction shall be new construction and shall be restricted to family or residential recreation type dwellings and attached or detached garages." The Covenants may be amended by a majority vote of the subdivision lot owners.

[¶4.] In 2007, Wilsons purchased a home on Lot 25 of Shirt Tail Gulch subdivision. Wilsons intended to use the home as a vacation home and eventually as a retirement home. In 2016, Maynards bought Lot 24, which was adjacent to Wilsons' home.

[¶5.] In the summer of 2016, Maynards began construction of a three-story home (Property) with five master bedrooms, five master bathrooms, and a half-bath on the lot. The Property could house up to fourteen people. Maynards intended to rent the Property to short-term guests for profit. Maynards also owned several other commercial rental properties and hotels in the Deadwood and Lead area. They owned and operated two real estate holding companies, Legendary Investments and Alpine Adventures, to manage their rental properties.

[¶6.] In October 2016, Wilsons' attorney sent a letter to Maynards requesting that Maynards provide assurance that they did "not intend to use the [P]roperty in any manner that violates the Covenants, for instance by using it as a rental property." Maynards did not respond to the letter and continued construction. In April 2017, Rory Maynard told Robert Wilson that Maynards intended to rent the Property to short-term guests and did not intend to use the Property for a bed and breakfast business.

[¶7.] Wilsons filed this action for declaratory judgment in May 2017, seeking a determination that Maynards' use of the Property for short-term rental income was prohibited by the Covenants. Wilsons also sought temporary and permanent injunctive relief prohibiting Maynards from renting the Property on a short-term basis. Following a hearing, the circuit court determined that Wilsons had not established that they would suffer irreparable harm and denied their motion for a preliminary injunction.

[¶8.] In June 2018, Maynards began renting the Property to short-term guests. They used several vacation rental websites to advertise the Property. On one of the websites, they advertised that the Property was "built with large groups in mind." Maynards testified that they use various social media platforms to "make a determination of who the [renters] are before we rent to them." Maynards stay at the Property a few nights a year, but it is undisputed that they primarily use the Property for short-term rentals.

[¶9.] Maynards rented the Property nine times in 2018. In 2019, they rented the Property nearly every day between June and September. During the 2018 and 2019 Sturgis Motorcycle Rallies, they rented the Property to twelve guests at once; and the Property has housed as many as twenty guests at a time. Maynards charge $500 for weekday stays, $650 for weekend stays, and up to $1,200 per day during the Sturgis Rally.

[¶10.] In November 2019, Wilsons and Maynards both moved for summary judgment. Wilsons argued short-term rentals were "an unambiguously commercial purpose" that violated the residential purpose provision of the Covenants.

Maynards argued that short-term rentals were a residential purpose consistent with the Covenants.

[¶11.] Following a hearing, the circuit court denied Wilsons' motion for summary judgment and granted Maynards' motion. The court concluded the language of the Covenants was unambiguous and looked within the "four corners" of the Covenants to determine whether short-term vacation rentals were a "residential purpose." It held that the Property's "design [and use] for residential recreational activities such as cooking, eating, drinking, sleeping, and gathering" was consistent with "residential purposes." Additionally, the court determined that the renters' use of the Property for eating, sleeping, and other ordinary living activities was a "normal home occupation" permitted by the Covenants. In the court's view, the fact that Maynards earned profit from renting the Property did not change the residential character of how renters used and enjoyed the Property, and nothing in the Covenants prohibited short- or long-term rentals or restricted the number of guests. The court further concluded that the Covenants expressly allowed the Property to be rented on a short-term basis because it permitted "bed and breakfast" businesses.

[¶12.] The circuit court also rejected Wilsons' argument that vacation rentals violated the Covenants' purpose to keep the subdivision free from nuisance. It held that "associated traffic" from renters "should be expected in any neighborhood." Short-term rental of the Property was not a nuisance merely because "the individuals occupying [it] differ on a given night." The court also held that Maynards complied with the Covenants' provision requiring construction of only

"family or residential recreation type dwelling[s]" because "[n]othing about the character of the [Property] suggests that it was not designed for families to occupy."

[¶13.] Wilsons appeal, arguing that the circuit court erred in holding short-term rentals did not violate the Covenants. Wilsons also claim that the circuit court erred in denying their request for a permanent injunction preventing Maynards from renting the Property.

### Analysis and Decision

[¶14.] "We review grants of summary judgment under the de novo standard of review. We decide whether genuine issues of material fact exist and whether the law was correctly applied[, and w]e will affirm a circuit court's decision so long as there is a legal basis to support its decision." *State v. BP plc*, 2020 S.D. 47, ¶ 18, 948 N.W.2d 45, 52 (internal citations omitted). "The [circuit] court's interpretation of a covenant is a legal question which we review de novo." *Jackson v. Canyon Place Homeowner's Ass'n, Inc.*, 2007 S.D. 37, ¶ 7, 731 N.W.2d 210, 212.

[¶15.] "The interpretation of a restrictive covenant involves the same rules of construction for contract interpretation. When the wording of the covenant is unambiguous, 'its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature.'" *Id.* ¶ 9. "[A] covenant is ambiguous if we have a genuine uncertainty as to which of two or more meanings is correct." *Id.* When language of a restrictive covenant is unambiguous, we consider the plain meaning of the words in the covenant. *See id.* ¶ 14; *Coffey v. Coffey*, 2016 S.D. 96, ¶ 8, 888 N.W.2d 805, 809.

[¶16.] Wilsons cite *Edwards v. Landry Chalet Rentals, LLC* in support of their argument that short-term rentals of the Property are not a "residential purpose" under the language of the Covenants. 246 So. 3d 754, 756 (La. Ct. App. 2018). In *Edwards*, restrictive covenants provided that "[n]o lot shall be used except for residential purposes" and also specifically prohibited commercial uses, stating that "[*n]o lot shall be used for any commercial purpose . . . .*" *Id.* at 755. The *Edwards* court held that short-term vacation rentals of a single-family dwelling on a lot were not a residential purpose because the renters were transient and because the defendant's rental of the property for "ongoing profit-making activity" was a commercial purpose. *Id.* at 758.

[¶17.] Maynards respond that *Edwards* is distinguishable because the Covenants explicitly permit some commercial or profit-making activity. Further, Maynards ask this Court to adopt the majority view of "dozens of courts around the country" that have held use of a property for eating, sleeping, and recreation for any duration is determinative as to whether the property is used for "residential purposes," regardless of the property owner's receipt of rental income.

[¶18.] "[C]ourts in a number of other states . . . have almost uniformly held that short-term vacation rentals do not violate restrictive covenants" that "requir[e] property to be used only for residential purposes and prohibiting its use for business purposes . . . ." *Santa Monica Beach Prop. Owners Ass'n, Inc. v. Acord*, 219 So. 3d 111, 114 (Fla. Dist. Ct. App. 2017) (citing cases from thirteen jurisdictions that have held restrictive covenants limiting the use of a property to "residential purposes" do not prohibit short-term rentals). "If a vacation renter uses a home for the purposes

of eating, sleeping, and other residential purposes, this use is residential, not commercial, no matter how short the rental duration." *Wilkinson v. Chiwawa Communities Ass'n*, 327 P.3d 614, 620 (Wash. 2014).

[¶19.] Courts have consistently reached this conclusion regardless of whether they determine the language "residential purposes" to be ambiguous or unambiguous. Some "courts have found no ambiguity [in 'residential purposes'], reasoning that, as long as the property is used for living purposes, it does not cease being 'residential' simply because such use [for short-term rentals] is transitory rather than permanent." *Houston v. Wilson Mesa Ranch Homeowners Ass'n, Inc.*, 360 P.3d 255, 259 (Colo. App. 2015). The duration of the rental has no bearing on whether or not the property is used for "residential purposes." *See, e.g., Tarr v. Timberwood Park Owners Ass'n, Inc.*, 556 S.W.3d 274, 291 (Tex. 2018); *Wilkinson*, 327 P.3d at 620; *Lowden v. Bosley*, 909 A.2d 261, 268 (Md. 2006); *Slaby v. Mountain River Estates Residential Ass'n, Inc.*, 100 So. 3d 569, 579 (Ala. Civ. App. 2012).

[¶20.] Other "courts have recognized ambiguity in ['residential purposes'] in cases involving short-term rentals or other situations where those residing in the property are living there only temporarily, not permanently . . . ." *Tarr*, 556 S.W.3d at 289. Nonetheless, "[t]hese courts [have] concluded that, because ambiguities in restrictive covenants [are] to be construed in favor of the free use of property, short-term rentals [are] not precluded as inconsistent with residential use." *Houston*, 360 P.3d at 258-59. *See, e.g., Mullin v. Silvercreek Condo. Owner's Ass'n, Inc.*, 195 S.W.3d 484, 490 (Mo. Ct. App. 2006); *Dunn v. Aamodt*, 695 F.3d 797, 801-02 (8th

#29307

Cir. 2012); *Pinehaven Plan. Bd. v. Brooks*, 70 P.3d 664, 667 (Idaho 2003); *Russell v. Donaldson*, 731 S.E.2d 535, 538-39 (N.C. Ct. App. 2012).

[¶21.]     Here, neither party claims the Covenants are ambiguous.  However, Maynards argue that if this Court determines the Covenants are ambiguous, then they must be strictly construed.  *See generally Luedke v. Carlson*, 73 S.D. 240, 243, 41 N.W.2d 552, 554 (1950) (stating restrictive covenants should be strictly construed).  Wilsons cite *Piechowski v. Case* for the contrary proposition that this Court does not require restrictive covenants to be strictly construed.  255 N.W.2d 72, 74 n.2 (S.D. 1977) ("We regard as dicta only, our statement in *Luedke v. Carlson* . . . that restrictive covenants (imposed upon a residential subdivision) are to be strictly construed in favor of the free use of property.").

[¶22.]     We agree with the view of both parties that "residential purposes" is unambiguous.  While the Covenants do not define "residential purposes," "failing to define terms does not automatically result in an ambiguity."  *Jackson*, 2007 S.D. 37, ¶ 11, 731 N.W.2d at 213.  An undefined term in a restrictive covenant "is not ambiguous if the term has a plain and ordinary meaning and that meaning can be defined."  *Halls v. White*, 2006 S.D. 47, ¶ 8, 715 N.W.2d 577, 581.  "We may use statutes and dictionary definitions to determine the plain and ordinary meaning of undefined words."  *Jackson*, 2007 S.D. 37, ¶ 11, 731 N.W.2d at 213.

[¶23.]     The word "residential" is commonly understood to pertain to "dwelling in a place for some time."  *Residence*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/residence (last visited Apr. 19, 2021).  Therefore, "residential purposes" may be plainly understood to include the occupation of a

-8-

home or dwelling for an indefinite length of time. We decline Maynards' request to strictly construe the Covenants. Instead, we rely on our normal rules of contract construction to conclude the plain language of "residential purposes" includes short-term rentals. *See Jackson*, 2007 S.D. 37, ¶ 9, 731 N.W.2d at 212 (applying our normal rules of contract construction to a restrictive covenant). *See also Halls*, 2006 S.D. 47, ¶ 7, 715 N.W.2d at 580; *Harlan v. Frawley Ranches PUD Homeowners Ass'n, Inc.*, 2017 S.D. 54, ¶ 7, 901 N.W.2d 747, 750.

[¶24.] The dissent does not suggest any other meaning for the language "residential purposes," nor does it offer any contrary authority to the multitude of cases that have held short-term rentals of a home are a "residential purpose." Rather, the dissent suggests that since the Covenants apply to owners of homes in the subdivision, the owner must live in the home to comply with the Covenants' "residential purposes" provision.[1] "[W]hen reading the Covenant in its entirety, it is apparent that the fourth article in the Covenant applies to the *owner's* use of Lot 24." Dissenting Opinion ¶ 39. There is no question that the Covenants apply to the owners, but the dissent's reading of this provision would prohibit a homeowner from leasing the home or allowing someone other than the owner to live in the Property. This interpretation simply cannot be countenanced under the plain language of the Covenants.

---

1. The dissent borrows the word "owners" from the preamble of the Covenants to suggest that only owners may use the Property for "residential purposes." However, the language concerning "present and future owners" in the preamble merely demonstrates the Covenants' intent to run with the land and benefit all present and future owners. A reading of this plain language does not remotely suggest that the Covenants also require every home in the subdivision to be owner-occupied.

[¶25.]      Wilsons ask this Court to conclude the receipt of rental income transforms a property's use from residential to strictly commercial. Yet, virtually every other jurisdiction that has examined this issue has held "that receipt of income does not transform residential use of property into commercial use." *Houston*, 360 P.3d at 260. "When property is used for a residence, there simply is no tension between such use and a commercial benefit accruing to someone else." *Lowden*, 909 A.2d at 267-68. "[T]he critical issue is whether the renters are using the property for ordinary living purposes such as sleeping and eating . . . . [T]he nature of a property's use is not transformed from residential to business simply because the owner earns income from the rentals." *Santa Monica Beach Prop. Owners Ass'n, Inc.*, 219 So. 3d at 114-15. *See, e.g., Wilkinson*, 327 P.3d at 620; *Dunn*, 695 F.3d at 801-02; *Slaby*, 100 So. 3d at 580; *Tarr*, 556 S.W.3d at 291-92; *Pinehaven Plan. Bd.*, 70 P.3d at 667-68; *Russell*, 731 S.E.2d at 539.

[¶26.]      We agree with these nearly universal holdings from other jurisdictions. The Covenants' "residential purposes" provision does not prohibit Maynards from profiting by renting to guests who use the Property as a short-term residence. If the Covenants intended "residential purposes" to prohibit profit-making activity as Wilsons and the dissent suggest, then the Covenants would even prohibit a long-term lease of the Property that generates a profit. There is nothing in the Covenants that suggests a home owner in Shirt Tail Gulch may not lease a residence on a short- or long-term basis, or that limits the occupancy of a home to a single-family.

[¶27.]    Finally, Wilsons and the dissent also focus on the language of the Covenants, which states that "residential purposes . . . shall include [1] ordinary home occupations and [2] offices of recognized professions and [3] bed and breakfast uses . . . ."[2] They argue that Maynards' use of the Property does not fit within any of these additional commercial uses permitted by the Covenants. However, the resolution of this case does not turn on whether Maynards' use fits within any of these three uses. Rather, the use of the Property is not prohibited by the Covenants because it is consistent with the common meaning of "residential purposes."

[¶28.]    Moreover, the Covenants' inclusion of these three uses does not limit the meaning of "residential purposes." Rather, these enumerated uses expand it. *See Am. Sur. Co. of New York v. Marotta*, 287 U.S. 513, 517, 53 S. Ct. 260, 261, 77 L. Ed. 466 (1933) ("'[I]nclude' is frequently, if not generally, used as a word of extension or enlargement rather than as one of limitation or enumeration."). If the Covenants were intended to confine the scope of "residential purposes," the Covenants could have included additional language to do so. "[O]ur well-

---

2.    Courts have generally held that "home occupations . . . are those [occupations] 'customarily' associated with residential dwellings" and that may be "appropriate" to base out of a residence. *Agnew v. Bushkill Twp. Zoning Hearing Bd.*, 837 A.2d 634, 638 (Pa. Commw. Ct. 2003). Some examples include an animal exhibition business, *In re Salton v. Town of Mayfield Zoning Bd. of Appeals*, 983 N.Y.S.2d 656, 658-59 (N.Y. App. Div. 2014), and an operation of a commercial trucking business, *Stevens v. City of Island City*, 324 P.3d 477, 480 (Or. Ct. App. 2014). SDCL 34-18-9.1(1) defines a "'[b]ed and breakfast establishment,' [as] any building or buildings run by an operator which is used to provide accommodations for a charge to the public, with at most five rental units for up to an average of ten guests per night and in which family style meals are provided . . . ." To be clear, the Court does not suggest that Maynards' use of the Property for vacation rentals is a "normal home occupation," an "office of recognized professionals," or a "bed and breakfast."

established rule [is] that in ascertaining the parties' intent, we will not rewrite [a contract or covenant] or add to its language." *Edgar v. Mills*, 2017 S.D. 7, ¶ 29, 892 N.W.2d 223, 231.

[¶29.] It is undisputed the Property is used to eat, sleep, and enjoy recreational activities. Therefore, short-term vacation rentals are a residential purpose consistent with the Covenants. Maynards' construction of a multi-bedroom vacation home on the Property is also consistent with the provision in the Covenants requiring construction of only "family or residential recreation type dwellings." Finally, Wilsons failed to make any showing that short-term rentals of the Property "fundamentally alter the character of Shirt Tail Gulch." Because Maynards did not breach the Covenants, the circuit court properly granted their motion for summary judgment and denied Wilsons' motion for injunctive relief.

[¶30.] We affirm.

[¶31.] GILBERTSON, Retired Chief Justice, and KONENKAMP, Retired Justice, concur.

[¶32.] KERN and DEVANEY, Justices, dissent.

[¶33.] KONENKAMP, Retired Justice, sitting for SALTER, Justice, disqualified.

[¶34.] MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.

#29307

KERN, Justice (dissenting).

[¶35.] While I agree that the Covenants' language is unambiguous, I disagree with the majority's interpretation allowing the Maynards to engage in what is undoubtedly a prohibited commercial endeavor. Such a reading ignores the provisions of the Covenants, which must be read as a whole to provide context and definition for the "residential purposes" provision.

[¶36.] Regarding the term "residential purposes," much of the circuit court's opinion and the Maynards' brief focus on how the renters use the three-story house in question. However, this analysis fails to consider the Covenants as a whole and instead defines the term in isolation. The fourth declaration in the Covenants provides:

> No lot may be used except for residential purposes, which shall include normal home occupations and offices of recognized professions and bed and breakfast uses allowed under State and County laws and regulations.

[¶37.] "Contract interpretation is a question of law reviewed de novo." *Charlson v. Charlson*, 2017 S.D. 11, ¶ 16, 892 N.W.2d 903, 907 (citation omitted). "In order to ascertain the terms and conditions of a contract, we examine the contract as a whole and give words their plain and ordinary meaning." *Id.* ¶ 16, 892 N.W.2d at 908. "We are required to give effect to the language of the entire contract, and particular words and phrases are not interpreted in isolation." *Jones v. Siouxland Surgery Ctr. Ltd. P'ship*, 2006 S.D. 97, ¶ 15, 724 N.W.2d 340, 345 (citation omitted).

[¶38.] In South Dakota, "servitude[s] should be interpreted to give effect to the intention of the parties ascertained from the language used in the

-13-

instrument[.]" *Brandt v. Cnty. of Pennington*, 2013 S.D. 22, ¶ 13, 827 N.W.2d 871, 875 (quoting Restatement (Third) of Property (Servitudes) § 4.1(1) (2000)). "The rule that servitudes should be interpreted to carry out the intent of the parties and the purpose of the intended servitude departs from the often expressed view that servitudes should be narrowly construed to favor the free use of land." Restatement (Third) of Property (Servitudes) § 4.1 cmt. a (2000). This rule "is based in the recognition that servitudes are widely used in modern land development and ordinarily play a valuable role in utilization of land resources. The rule is supported by modern case law." *Id.*

[¶39.]     In keeping with this standard of review and by examining the entire document, the proper context of the fourth declaration in the Covenants is more fully understood.[3] Notably, before the list of Covenants, an introductory preamble provides:

> The following declarations constitute covenants to run with the land and with the above described property, and shall be binding upon all parties and *persons having an interest in said property, for the benefit of and limitations on all present and future owners of said property, so long as said declarations remain in effect as hereinafter provided.*

(Emphasis added.) Likewise, the first declaration of the Covenants provides in part that the Covenants, "shall inure to the benefit of *each owner* thereof, and for the further purpose of creating and keeping the above-described property, insofar as possible, desirable, attractive, free from nuisance and suitable in architectural

---

3.     *See Tarr*, 556 S.W.3d at 289 (reasoning "'residence' is a term of multiple meanings" . . . but "the appropriate meaning can be discerned from 'the context in which it is used'" (citations omitted)).

design, materials and appearance, and for the purpose of guarding against fires and unnecessary interference with the natural beauty of the lots, for the mutual benefit and protection *of the owners of all lots*, and the surrounding and adjacent property." (Emphasis added.) Therefore, when reading the Covenants in its entirety, it is apparent that the fourth article in the Covenants applies to the *owner's* use of Lot 24.[4] The recitals within the Covenants are valuable in discerning the intended limitations the Covenants placed on the uses of the lots. *See Jennings v. Rapid City Reg'l Hosp., Inc.*, 2011 S.D. 50, ¶ 11, 802 N.W.2d 918, 922 (reasoning that the recitals in a contract showed the contracts' clearly expressed intent to benefit employees.)

[¶40.]     To support its contrary interpretation, the majority opinion focuses on how the *renters* use the property. And the primary authority relied upon by the majority is based upon this same interpretation. The majority relies on *Santa Monica Beach Property Owners Association, Inc.* for the proposition that when "determining whether short-term vacation rentals are residential uses of the property, the *critical issue* is whether the *renters are using the property* for ordinary living purposes such as sleeping and eating[.]" 219 So. 3d at 114 (emphasis added) (citations omitted); *see also* Majority Opinion ¶ 25. Even though other courts have read covenants this way, borrowing that interpretation here, would violate the

---

4.     The majority opinion claims that this language merely shows the Covenants' intent to run with the land and benefit all present and future owners. While this is true, it cannot be denied that the language also shows the intent to enforce the Covenants' provisions as "*limitations* on all present and future *owners*[.]" (Emphasis added.) The Maynards' status as owners of Lot 24 places them under the obligation to use Lot 24 for residential purposes.

plain, unambiguous language of the Covenants at issue here and the canon of construction, which prohibits courts from reading the provisions of the Covenants in isolation.

[¶41.]    Moreover, the Maynards admit in their brief that they "are not aware of any reported case that has involved similar language as paragraph four of the Covenants." This is not surprising. Not only do all covenants differ, but so do the ordinances, state laws, and judicial precedents in each jurisdiction under which they will be interpreted. This is well exemplified in *Santa Monica Beach Property Owners Association, Inc.*, where the decision of the Florida District Court, holding that a short-term vacation rental was a permitted residential purpose, was based on an interpretation of the servitude favoring the free, unrestricted use of the property. Importantly, this standard is directly contrary to our own, which provides that "[a] servitude should be interpreted to give effect to the intention of the parties ascertained from the language used in the instrument . . . and to carry out the purpose for which it was created." Restatement (Third) of Property (Servitudes) § 4.1(1) (2000); *Brandt*, 2013 S.D. 22, ¶ 13, 827 N.W.2d at 875; *see also supra* ¶ 38. Other courts' interpretations of differing covenants are not controlling here. Rather, the text of the Shirt Tail Gulch Covenants controls.

[¶42.]    The majority opinion suggests that there must be some "meaning for the language 'residential purposes'" supported by authority from other jurisdictions.[5] *See* Majority Opinion ¶ 24. But by relying solely upon this approach,

---

5.    The North Dakota Supreme Court, in *Hill v. Linder*, had occasion to analyze a covenant containing the restriction that property be used for "residential

(continued . . .)

the majority opinion skips the important step of examining the Covenants' plain meaning within its unique and specific context. The Covenants here place plain limitations on how the owners use their property. Bypassing this crucial step and relying on the myriad of decisions interpreting specific covenants from other jurisdictions is unhelpful to the analysis of the four corners of the Covenants at issue under our applicable law. If the Covenants here are truly unambiguous, as the majority opinion and both parties assert, then "the intent of the parties can be derived from within the four corners of the contract." *Gores v. Miller*, 2016 S.D. 9, ¶ 15, 875 N.W.2d 34, 39. Accordingly, we examine the use of the property by the owners, as set forth in the parties' statements of undisputed material fact.

[¶43.] The Maynards live in Spearfish, South Dakota, and have never made Lot 24 of Shirt Tail Gulch their personal residence. They built this property for the specific purpose of using it for a vacation rental business. This is apparent from the terms of their construction loan for the project which required the Maynards to "maintain insurance against rent loss" and assign the rents to the financier in case of default. The property is owned by a corporate entity, Alpine Adventures. The

---

(. . . continued)

purposes only." 2009 N.D. 132, ¶ 13, 769 N.W.2d 427, 432. The court held that the phrase prohibited homeowners from operating a licensed day-care facility in their home because the day-care was not an incidental business use. In so concluding, the court reasoned "that the usual, ordinary and incidental use of property as a residence does not violate a covenant restricting use of the property to residential purposes only, but that an unusual and extraordinary use may constitute a violation, and that an incidental business use does not violate a covenant for residential purposes only as long as the business use is casual, infrequent or unobtrusive." *Id.* If we were to apply a similar approach here, the record reveals the Maynards' use of Lot 24 is a commercial business that is neither casual nor infrequent and certainly not incidental to a residential purpose.

Maynards advertise the rental property on their own website as well as on third-party websites and have developed a limited "vetting process" to screen potential renters. Their projected gross revenue from the property is nearly $60,000 per year, with nightly rentals ranging from $500 per night to $1200 per night. The Maynards charge customers sales tax on the rentals. Lot 24 is advertised as being "[b]uilt with large groups in mind," and "boast[ing]" five master suites.

[¶44.] The three-story house is rented out approximately 92-120 nights per year. During the summer months, the property is rented out nearly every day. To protect against loss occurring on the property, the Maynards carry commercial insurance for Lot 24 and the rental. Reviewing just this cursory enumeration of undisputed facts, it can hardly be said that the Maynards have anything other than a "commercial" venture. *See The American Heritage College Dictionary* 280 (3rd ed. 1997) (defining commercial as "[e]ngaged in commerce" or "[h]aving profit as chief aim."). Undoubtedly, the Maynards' use of their property does not fit one of the permitted residential purposes.[6]

[¶45.] Further meaning and context of "residential purposes" can be derived from the Covenants' inclusion of three specific uses of Lot 24 which have commercial characteristics. The Covenants identify these uses in the fourth declaration, to wit: "normal home occupations and offices of recognized professions and bed and breakfast uses allowed under State and County laws and regulations."

---

6.   The Maynards' commercial use of their property is in stark contrast to the Wilsons' use of their neighboring property. The Wilsons bought their house in Shirt Tail Gulch in 2007, to use as their personal residence upon their retirement and spent nearly $1 million renovating and constructing additions to their home.

The Maynards make no claim that they use the property as an office of a recognized profession. And as discussed below, the short-term vacation home rental activity occurring on Lot 24 does not fit within the other two permitted uses—normal home occupations or as a bed and breakfast— which the majority opinion concedes. *See* Majority Opinion ¶ 27.

[¶46.] The circuit court held that the Shirt Tail Gulch Covenants' phrase "normal home occupations" permits short-term vacation home rentals. To reach this conclusion, the court reasoned that "the drafters' inclusion of [a bed and breakfast facility] is telling" because "[i]t demonstrates that the covenant was not designed to prohibit short-term rentals," and "[i]t is inconsequential that vacation rentals are not expressly listed as a permissible use because they fall within the meaning of 'normal home occupations.'" Further, the court reasoned that, although the term "vacation rental" is missing from the permitted commercial type uses expressly listed in the fourth declaration of the Covenants, the word "includes," preceding the listed uses, should be interpreted to mean that the "examples enumerated in the text are intended to be illustrative, not exhaustive."

[¶47.] The circuit court misinterpreted both the meaning of a normal home occupation and the significance of the inclusion of the bed and breakfast use in the Covenants. Bed and breakfast establishments are defined in SDCL 34-18-9.1(1)-(3) as:

> (1) "Bed and breakfast establishment," any building or buildings run by an operator which is used to provide accommodations for a charge to the public, with at most five rental units *for up to an average of ten guests per night* and *in which family style meals are provided*;

> (2) "Family style meal," any meal ordered by persons staying at a bed and breakfast establishment which is served from common food service containers, as long as any food not consumed by those persons is not reused;
> (3) "Operator," the owner or the owner's agent, *who is required to reside in the bed and breakfast establishment or on contiguous property.*

(Emphasis added.)

[¶48.] Here, the operators—the Maynards—allow more than ten guests per night, do not serve family style meals, and do not live in the home on Lot 24. The Maynards' use of Lot 24 is *far* from being a bed and breakfast use as their commercial use meets none of the criteria. Although the circuit court concluded that the drafter's inclusion of the bed and breakfast exception means that Lot 24 was allowed to be rented on a short-term basis *other than as an actual bed and breakfast*, there is only one "bed and breakfast" use as defined by South Dakota law. Importantly, SDCL 34-18-1(17) defines a "Vacation home establishment" which specifically excludes bed and breakfast enterprises as follows:

> "Vacation home establishment," any home, cabin, or similar building that is rented, leased, or furnished in its entirety to the public on a daily or weekly basis for more than fourteen days in a calendar year and is not occupied by an owner or manager during the time of rental. *This term does not include a bed and breakfast establishment as defined in subdivision 34-18-9.1(1)*[.]

(Emphasis added.) The circuit court ignored this statute when it held that "[v]acation rentals and bed and breakfasts are similar enterprises." The canon of construction "expressio unius est exclusio alterius," which is to say, "the expression of one thing is the exclusion of another" applies here. *See Aman v. Edmunds Cent. Sch. Dist. No. 22-5*, 494 N.W.2d 198, 200 (S.D. 1992). The fourth declaration in the Covenants permits bed and breakfast uses in accordance with state law. Vacation

home establishments are not included. The circuit court erred by conflating the two separately defined uses into one permitted use.

[¶49.] This leaves the question of whether the Maynards' use of Lot 24 constitutes a "normal home occupation." The circuit court erred when it held that the Maynards' use of the property constituted a normal home occupation because the renters are using Lot 24 as any homeowner would have used it. The court held that a renter's use of Lot 24 mirrors a homeowner's use because: "they sleep, cook, eat, drink, and gather there. This use has not destroyed the expected character of the Shirt Tail Gulch neighborhood[.]"

[¶50.] However, the circuit court cited no authority for the definition of a normal home occupation nor cited any authority holding that a vacation home rental business is a normal home occupation and instead crafted its own definition.

[¶51.] The majority opinion defines "home occupations" as being an occupation "'customarily' associated with residential dwellings" that may be "appropriate" to base out of a residence. *See Agnew*, 837 A.2d at 638. *See also* Majority Opinion ¶ 27 n.2. Significantly, in every decision cited by the majority, defining or distinguishing a home occupation, the owner lived in the home.[7] Here,

---

7. *See Agnew*, 837 A.2d at 635 (owner lived in house where his roofing business was located); *In re Salton*, 983 N.Y.S.2d at 658 (owner lived in house where his animal exhibition business was located); *Stevens*, 324 P.3d at 478 (owner lived on same property where his operation of a commercial trucking business was located); *Sanantonio v. Lustenberger*, 901 N.Y.S.2d 109, 110 (N.Y. App. Div. 2010) (owner lived in same home where a professional hairdressing business was located); and *Williams v. Lexington Cnty. Bd. of Zoning Appeals*, 776 S.E.2d 749, 750 (S.C. Ct. App. 2015) (owner lived in a home with an adjacent dog grooming business on the property).

the Maynards do not live and never have made their personal residence in the house on Lot 24.

[¶52.]    The Maynards further attempt to blur the difference between how they are using Lot 24 and what a normal home occupation allows. They claim that their short-term vacation rentals are permitted because they are *similar enough* to a bed and breakfast commercial use and a normal home occupation. But a normal home occupation is far different from a bed and breakfast use.[8] The two uses are listed separately in the Covenants, and if they were interpreted to mean the same thing, enumerating "normal home occupations" and "bed and breakfast" would be superfluous. Additionally, a vacation home rental is not a normal home occupation even if the renter's use of Lot 24 could be conducted entirely within the structure. *See Agnew*, 837 A.2d at 638 n.11 (compiling cases where home businesses were found not to be "home occupations" despite the business being done entirely inside the home). As the majority opinion acknowledges,[9] a short-term vacation rental business is different from a normal home occupation. The circuit court erred in its classification of the Maynards' use of Lot 24 as such.

---

8.    Courts have concluded that bed and breakfast commercial arrangements are not properly classified as normal home occupations. *See Reynolds v. Zoning Hearing Bd. of Abington Twp.*, 578 A.2d 629, 631 (Pa. Commw. Ct. 1990) ("A Bed and Breakfast [was] not [c]learly incidental or secondary to the use of the dwelling for dwelling purposes and is therefore not a home occupation. It is more like a boarding house or a hotel . . . than a traditional undefined type of home occupation such as a craft shop, dressmaker or seamstress occupation." (citation omitted)). *See also Town of Sullivans Island v. Byrum*, 413 S.E.2d 325, 328 (S.C. Ct. App. 1992) (holding "a Bed & Breakfast is not a home occupation.").

9.    *See* Majority Opinion ¶ 27 ("[T]he resolution of this case does not turn on whether Maynards' use fits within any of these three uses.").

[¶53.] The majority opinion suggests that the "reading of this provision would prohibit a homeowner from leasing the home or allowing someone other than the owner to live in the Property." *See* Majority Opinion ¶ 24. Obviously, the Covenants' inclusion of the bed and breakfast use as "allowed under State and County law and regulations," contradicts this claim because, under the statutory framework for a bed and breakfast use, the homeowner could lease out rooms so that others may live temporarily on the property. Furthermore, the majority opinion suggests that our conclusion would prohibit any profit-making motive the Maynards would have, such as long-term lease agreements. However, our focus must be on giving effect to the intent of the Covenants as clearly expressed in view of the surrounding circumstances. Under the majority opinion's reading of the Covenants, very little stands in the way of the Maynards operating any type of lodging establishment[10] on Lot 24 so long as the renters simply eat, sleep, and live on the premises on a short-term basis.

[¶54.] Although the Covenants do not define residential purposes, in each of the permitted commercial uses detailed in the Covenants, the owner must live in the home where the commercial activity occurs. This also evinces the intent of the Covenants to permit some types of commercial uses and not others. Short-term vacation rentals are not listed within the enumerated exception to "residential

---

10. A "lodging establishment" is defined in SDCL 34-18-1(7) as "any building or other structure and property or premises kept, used, maintained, advertised or held out to the public to be a place where sleeping accommodations are furnished for pay to two or more transient guests. The term includes hotels, motels, cabins, bed and breakfast establishments, lodges, vacation home establishments, dude ranches, and resorts[.]"

purposes," and nothing in the Covenants reveals an intention to allow them. Without question, the Maynards' commercial purpose for Lot 24 far exceeds the plain language of the Covenants. The majority opinion sidesteps this and, instead, relies on interpretations from other courts, interpreting unique covenants under their applicable jurisprudence, state laws, and ordinances.

[¶55.]     The Maynards' operation of a short-term vacation rental on Lot 24 fundamentally alters the residential nature of the Shirt Tail Gulch subdivision and violates the restrictive covenants protecting it. I would reverse and remand with instructions to enjoin the Maynards from operating a vacation home rental business.

[¶56.]     DEVANEY, Justice, joins this writing.